FILED

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION 2006 APR 20 P 2: 33



ABDULLAH M. AL-RAYES; ENTERPRISE
PROPERTIES, INC.; RANGER INVESTMENTS, INC.;
RANGER-KENMAR, INC.; ESSEX
INVESTMENTS, INC.; and ESSEX-TRIANGLE, INC.,

       Plaintiffs,

vs.

Case No.

3:06-cv-362-J-20HTS

BEN H. WILLINGHAM, JR.; LINDA L. ORTAGUS
a/k/a LINDA L. WILGOSZ; THOMAS J. MCAFEE, JR.;
CALVIN H. HUDSON; ELLEN HUDSON; THE
CALVIN H. HUDSON INDIVIDUAL RETIREMENT
ACCOUNT; LARRY P. JONES; TOWNSEND & JONES;
LOBRANO, KINCAID & QUESADA; STEPHEN D.
LOBRANO; CORIM AG; CORIM, INC.; CORIM
TERRATRADE, INC.; CORIM FLORIDA, INC.;
CORIM TENNESSEE, INC.; CORIM INVESTMENTS,
INC.; CORIM PROPERTY SERVICES, LTD.;
THE INTREPID CORPORATION; JEGEN
INVESTMENTS, INC.; NEW BETHEL FARMS, INC.;
and JOHN DOES 1-10,

       Defendants.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiffs, Abdullah M. Al-Rayes, Enterprise Properties, Inc., Ranger Investments, Inc.,

Ranger-Kenmar, Inc., Essex Investments, Inc. and Essex-Triangle, Inc. (collectively at times,

"the plaintiffs"), by and through their attorneys, sue defendants, Ben H. Willingham, Jr., Linda

L. Ortagus a/k/a Linda L. Wilgosz, Thomas J. McAfee, Jr., Calvin H. Hudson, Ellen Hudson,

The Calvin H. Hudson Individual Retirement Account, Larry P. Jones, Townsend & Jones,

Lobrano, Kincaid & Quesada, Stephen D. Lobrano, Corim AG, Corim, Inc., Corim Terratrade,

Inc., Corim Florida, Inc., Corim Tennessee, Inc., Corim Investments, Inc., Corim Property

Services, Ltd., The Intrepid Corporation, Jegen Investments, Inc., New Bethel Farms, Inc. and John Does 1-10, and allege as follows:

## NATURE OF ACTION

1.        The claims set forth herein arise out of a massive fraud perpetrated by the above-captioned defendants and John Does 1-10 (collectively at times, the "RICO Defendants") who, unbeknownst to the plaintiffs, acted as both sellers and as agents for the plaintiff-buyers in connection with the purchase by plaintiffs of several commercial office buildings.

2.        More specifically, the RICO Defendants employed various schemes including one common scheme whereby they would purportedly represent a plaintiff in negotiations for the purchase of a particular office building from one of the named corporate defendants. Then, after taking the plaintiffs' purchase money, this corporate defendant would purchase the office building with these funds from the true owner which was either a third party or, at times, one of the corporate defendants, and "flip" it to that plaintiff at a substantial markup.

3.        Indeed, in seven such transactions for which the RICO Defendants acted on behalf of both buyer and seller, the plaintiffs collectively paid approximately $53,160,650, while the RICO Defendants made undisclosed profits from these transactions amounting to approximately $14,707,605. Apparently, the plaintiffs are merely a few of the many victims of this sort of fraud by the RICO Defendants; a review of various court dockets disclosed that several of the RICO Defendants have been sued by other "clients" (and found liable) for similar fraudulent acts in connection with other commercial property transactions and investigation has determined that other victims exist that have not sued the RICO Defendants despite incurring damages similar to those suffered by the plaintiffs as set forth herein.

4.      The plaintiffs are also suing certain of the defendants in connection with approximately $11 million in additional management/brokerage fees collected from the plaintiffs after these buildings were purchased.   Investigation shows that the various defendants who collected these fees were never registered real estate brokers, as represented, and according to various state laws, these fees must be disgorged.

5.      Finally, the plaintiffs are suing for breach of certain Management Agreements which required, among other things, that defendants were to turn over books and records relating to the properties covered by these Management Agreements upon termination; despite such termination, the defendants have steadfastly refused to turn over critical records necessary for the plaintiffs to file taxes on a timely basis.

## JURISDICTION and VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 in that various of the claims asserted herein arise under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

7.      This Court has jurisdiction over plaintiffs' state law claims pursuant to principles of pendant jurisdiction.

8.      Venue is properly within this district pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to this action occurred within this judicial district.

## PARTIES

9.      Plaintiff Abdullah M. Al-Rayes ("Al-Rayes") is an individual who resides in Switzerland.

10.     Plaintiff Enterprise Properties, Inc. ("Enterprise Inc.") is a corporation organized and existing under the laws of Florida, with its principal place of business presently located in New York, New York.

11.     Plaintiff Ranger Investments, Inc. ("Ranger") is a corporation organized and existing under the laws of Georgia, with its principal place of business presently located in New York, New York.

12.     Plaintiff Ranger-Kenmar, Inc. ("Ranger-Kenmar") is a corporation organized and existing under the laws of Georgia, with its principal place of business presently located in New York, New York.

13.     Plaintiff Essex Investments, Inc. ("Essex") is a corporation organized and existing under the laws of Georgia, with its principal place of business presently located in New York, New York.

14.     Plaintiff Essex-Triangle, Inc. ("Essex-Triangle") is a corporation organized and existing under the laws of Georgia, with its principal place of business presently located in New York, New York.

15.     Each of the plaintiffs is a "person" as defined in 18 U.S.C. § 1964(c), which has been injured in its business or property as a direct and proximate result of the acts of

racketeering committed by enterprises created and controlled by the RICO Defendants and through which they carried out their illegal schemes.

16.     Defendant Ben H. Willingham, Jr. ("Willingham") is an individual who, upon information and belief, resides in Duval County, Florida.

17.     Defendant Linda L. Ortagus a/k/a Linda L. Wilgosz ("Ortagus") is an individual who, upon information and belief, resides in Duval County, Florida.

18.     Defendant Thomas J. McAfee, Jr. is an individual who, on information and belief, resided in Duval County, Florida during all relevant times.

19.     Defendant Calvin H. Hudson ("Calvin Hudson") is an individual who, on information and belief, resided in Duval County, Florida during all relevant times.

20.     Defendant Ellen Hudson is an individual who, on information and belief, resided in Duval County, Florida during all relevant times.

21.     Defendant The Calvin H. Hudson Individual Retirement Account (the "Hudson IRA") is a fund which, on information and belief, is maintained by Calvin Hudson and Ellen Hudson in Duval County, Florida.

22.     Defendant Townsend & Jones is, on information and belief, a professional partnership organized and existing under the laws of Georgia, with its principal place of business located in Duluth, Georgia.

23.      Defendant Larry P. Jones ("Jones") is an individual who, on information and belief, resides in Duluth, Georgia.

24.      Defendant Lobrano, Kincaid & Quesada (the "Lobrano Firm") is, on information and belief, a professional partnership organized under the laws of Florida, with its principal place of business located in Jacksonville, Florida.

25.      Defendant Stephen D. Lobrano ("Lobrano") is an individual who, on information and belief, has been incarcerated for first degree grand theft at the Baker Work Camp in Sanderson, Florida since December 2001.

26.      Defendant Corim AG is a corporation organized and existing under the laws of Switzerland, with its principal place of business located in Zollikon, Switzerland.

27.      Defendant Corim, Inc. is a corporation organized and existing under the laws of Georgia, with its principal place of business located in Jacksonville, Florida.

28.      Defendant Corim Terratrade, Inc. ("Corim Terratrade") is a corporation organized and existing under the laws of Florida, with its principal place of business located in Jacksonville, Florida.

29.      Defendant Corim Florida, Inc. ("Corim Florida") is a corporation organized and existing under the laws of Florida, with its principal place of business located in Jacksonville, Florida.

30.      Defendant Corim Tennessee, Inc. ("Corim Tennessee") is a corporation organized and existing under the laws of Tennessee, with its principal place of business located in Jacksonville, Florida.

31.      Defendant Corim Investments, Inc. ("Corim Investments") is a corporation organized and existing under the laws of Florida, with its principal place of business located in Jacksonville, Florida.

32.      Defendant Corim Property Services, Ltd. ("Corim Property Services") is a limited partnership organized and existing under the laws of Florida, with its principal place of business located in Jacksonville, Florida.

33.      Defendant The Intrepid Corporation is a corporation organized and existing under the laws of Florida, with its principal place of business located in Jacksonville, Florida.

34.      Defendant Jegen Investments, Inc. ("Jegen") is a corporation organized and existing under the laws of Georgia, with its principal place of business located in Jacksonville, Florida.

35.      Defendant New Bethel Farms, Inc. ("New Bethel") is a corporation organized and existing under the laws of Florida, with its principal place of business located in Jacksonville, Florida.

36.      Plaintiffs are ignorant of the true names and capacities of the defendants sued herein as John Does 1-10, and therefore sue them by such fictitious names. Plaintiffs are

informed and believe, and on that basis allege, that said Does are in some way responsible for the damages and injuries to them as hereinafter set forth. Plaintiffs will amend this Complaint to allege the true names and capacities of John Does 1-10 when ascertained.

37.     Plaintiffs are informed and believe, and on that basis allege, that at all times herein the aforementioned John Does 1-10, and each of them, were the agents and employees of the other RICO Defendants, and in doing the things herein alleged, were acting within the course and scope of such agency and employment.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Scheme To Defraud

38.     At all relevant times, the RICO Defendants were led, and their actions were primarily directed by, Willingham.

39.     The general scheme engineered by Willingham with the aid of the other RICO Defendants was to gain the trust of a potential investor in commercial real estate who was located overseas and, while claiming to act on behalf of that investor, "locate" an attractive investment with the stated expectation that the RICO Defendants would earn a profit through an agreement to manage the property after the purchase. They would then, using the investor's money, purchase the property at one price and resell the property to the investor at a substantially higher price.

40.     With respect to many of the property closings at issue, Stephen D. Lobrano of the Lobrano Firm represented to Dr. Renato A. Vanotti ("Vanotti") and Al-Rayes that he and the Lobrano Firm were acting as legal counsel to Al-Rayes and his corporate entity

used to make the respective property purchases at issue in this action, although it has now been determined that he was, at all times, interested solely in advancing the improper interests of the RICO Defendants in these transactions.

41.     Upon information and belief, Lobrano, who was prosecuted by both the State of Florida and the Florida State Bar, was tried and convicted in 2001 of first degree grand theft based on charges that he converted his clients' trust funds in excess of $1.5 million for his personal use.  Upon further information and belief, Lobrano resigned his membership in the Florida State Bar in lieu of disciplinary hearings, without leave to seek readmission, effective on May 2, 2002.

42.     With respect to the closings related to Essex and Essex-Triangle, the Townsend Firm and attorney Jones represented to Vanotti and Al-Rayes that they were acting as legal counsel to Ranger in connection with these transactions, although it has now been determined that he was, at all times, interested solely in advancing the improper interests of the RICO Defendants in these transactions.

43.     In the present case, the plaintiffs first learned of Willingham and the RICO Defendants through a solicitation in a Swiss newspaper concerning the sale of an office building in Jacksonville, Florida.

44.     Based on this solicitation, in or around 1993, Vanotti first contacted Willingham on behalf of his investment client, Al-Rayes.

45.     Willingham claimed that Corim AG, through its United States subsidiaries, "would make the purchase and ownership of American real estate as easy as the purchase of stocks and bonds."

46.     Willingham claimed he could accomplish this by providing services that included everything from initial acquisition analysis up to and including all of the necessary tax returns relating to any investments in an office building.

47.     Willingham described that the name "Corim" was an acronym representing the various activities in which Corim was active: "Corporation for Real Estate Investment and Management."

48.     Initial meetings with Willingham included discussions concerning the purchase of 7601 Centurion Parkway, in Jacksonville, Florida, sometimes referred to as the "Lamborghini building." However, when Lamborghini, the company, was sold to an Indonesian entity in early 1994, this purchase was no longer an option.

49.     Instead, Willingham suggested that Al-Rayes look at another building which was available, 6900 Southpoint Drive, in Jacksonville, Florida, sometimes referred to as the "Chemical Bank Building," as described below.

50.     The plaintiffs were certainly not the first victims of the RICO Defendants. As described in litigation files recently discovered by the plaintiffs, Willingham practiced and refined the fraudulent activity perpetrated by the RICO Defendants over the course of at least 10 years prior to the malfeasance directed at the plaintiffs.

51.      For instance, according to court documents, in or around 1984 Corim, Inc. and Willingham, through a wholly owned subsidiary, Corim Agri, Inc., entered into a similar transaction with one of its clients, Angelo Caldas ("Caldas"), for the purchase of a property it did not own until after taking approximately $1.3 million from Caldas. Corim Agri then purchased that property from its owner some three days after taking Caldas' money. Corim Agri paid approximately $1 million for the property keeping the balance as a windfall.

52.      Upon being sued by Caldas, the Corim entities and Willingham argued that this was a buyer-seller relationship and that they were not the agent of Caldas giving rise to a duty or agency relationship. The Fifth Circuit rejected these arguments, noting that, like here, there was a solicitation by the defendants to find properties for the plaintiff and that the fact money was taken *before* the property was owned by the defendants was strong evidence of an agency relationship. This case was settled shortly after a jury was empanelled.

53.      Next, not having been deterred by the Caldas litigation, Willingham solicited a number of German investors in or around 1988 with promises that he would locate commercial real estate properties for these individuals and, after any purchase was made, Willingham and his companies would enter into management agreements concerning the acquired properties with the buyers.

54.      Ultimately, the German investors agreed to purchase buildings through Willingham and his entities in the Southeastern United States. As here, the German investors were led to believe that Willingham and his entities were their agents and that Willingham's legal counsel was, in fact, acting on their behalf.

55.      In or around 1992, the German investors discovered that one of the buildings purchased on their behalf had been subject to two closings on the date of their purchase – one closing was between a shell company formed by Willingham and the owner of the building wherein Willingham paid $774,000. In the second transaction, Willingham's shell company sold the building to the German investors for $1,985,000. Upon learning of this transaction, the German investors cancelled their management agreement with Willingham and his entities and sued him alleging, among other things, fraud and breach of fiduciary duty. A jury verdict in favor of the plaintiffs was affirmed by the Sixth Circuit.

56.      It is not yet clear how many other clients were defrauded by Willingham and his entities in this same manner, but there is certainly a pattern of racketeering behavior which, including the malfeasance directed at the plaintiffs, spans more than two decades. Ironically, during the course of his litigation with the German investors, Willingham was perpetrating an almost identical fraud on the plaintiffs and, upon information and belief, Willingham even used money obtained from the plaintiffs to pay the judgment entered in that litigation.

57.      Ultimately, however, by the time of the first fraudulent transaction relating to the plaintiffs in July 1994, Willingham had crafted his scheme to a fine art. Not only did he represent that he was acting on behalf of the plaintiffs, he actually took the steps of incorporating each of the plaintiffs on behalf of Al-Rayes and acted as officer with complete authority to take any steps necessary to purchase the commercial properties in question on Al-Rayes' behalf.

58.      In fact, the relationship was described by Willingham as a sort of "joint venture relationship" whereby the RICO Defendants were going to earn a profit by taking a 2.5%

commission on the purchase of a given property and, thereafter, acting as the property manager for any properties purchased by the plaintiffs.

59.     Notwithstanding the agreement between the parties, as shown below, the RICO Defendants indeed did make substantial improper and undisclosed profits on the sale of these properties (collectively, at times, the "Properties") to the plaintiffs.

### The Enterprise Properties, Inc. Transactions

60.     The first of the entities created by Willingham for the purpose of taking title to commercial property on behalf of Al-Rayes was Enterprise Properties.

### A. 6900 Southpoint Drive (Jacksonville, Florida)

61.     Enterprise Properties was first created on or about March 16, 2004 by Willingham as a limited partnership for which Corim, Inc. acted as general partner and of which Calvin Hudson and Ellen Hudson were limited partners (the Limited Partnership").

62.     On information and belief, the sole purpose of creating the Limited Partnership was to purchase the Chemical Bank Building.

63.     Ultimately, the Limited Partnership was created on or about March 16, 1994, one day after it received a commitment letter from a lender for funds to purchase the Chemical Bank Building.

13

64.     On or about April 21, 1994, Willingham, Calvin Hudson and Ellen Hudson created Enterprise Properties and, on April 22, 1994, they transferred all assets, rights and obligations of the Limited Partnership to Enterprise Properties.

65.     On information and belief, in exchange for $702,610.72, all issued and outstanding stock of Enterprise Properties was then transferred on April 22, 1994 to the Hudson IRA.

66.     On further information and belief, title to the Chemical Bank Building was next taken by the limited Partnership on or about April 25, 1994 by payment of approximately $3,375,000, of which $2,700,000 was in the form of a loan secured by a mortgage on the property.

67.     At or around the same time as the purchase of the Chemical Bank Building, Willingham began his efforts to "flip" this property to Al-Rayes at a substantial profit.

68.     Specifically, Willingham mailed an "information package" concerning the Chemical Bank Building to Vanotti in Switzerland through Corim AG and invited Vanotti and Al-Rayes to Jacksonville to view this building which, according to Willingham, was owned by a third party.

69.     In response, Al-Rayes and Willingham, primarily through Vanotti, had telephonic discussions in Spring 1994, followed by in-person discussions at the Corim, Inc. offices in Jacksonville, Florida when Al-Rayes accepted Willingham's invitation to view this property.

70.     During this visit, Willingham indicated that he would set up a corporation and call it Enterprise Properties, Inc., named after the Enterprise aircraft carrier depicted in a photo on his office wall.

71.     Willingham offered to act as an officer of Enterprise Properties and use it to purchase the Chemical Bank Building. He recommended that the purchase be made through this corporate entity because, if the current owner of the building knew it was a wealthy foreigner interested in the building, he would hold out for a higher price.

72.     Willingham did not disclose to Al-Rayes that, as of the date of these representations, Enterprise Properties had already been set up by him with the intent of taking title to the Chemical Bank Building or that the Hudsons were fully aware of the identity of Al-Rayes.

73.     Al-Rayes, Vanotti and Willingham met in Corim, Inc.'s Jacksonville offices to discuss negotiation strategy for the purchase of the building. Willingham said the owner was asking for $6,500,000 as a purchase price.

74.     Willingham even presented Al-Rayes with a June 3, 1994 "replacement value" appraisal which valued the property at $5,963,760-$6,662,520. Willingham did not disclose, however, that he had, less than two months earlier, purchased the property on behalf of the Limited Partnership for a mere $3,375,000.

75.     Ultimately, Al-Rayes instructed Willingham to offer $4,500,000 and authorized a five percent commission which was to be split between Vanotti's employer and

Corim, Inc., and that if the bid was successful, Corim, Inc., through a subsidiary, would manage the building for Al-Rayes.

76.     Willingham stated that this offer was far too low and that the owner would likely become upset, rather than agree, however, he later informed Al-Rayes and Vanotti that he was able to negotiate the deal at the price offered; at no time did Willingham disclose his affiliation with the owner.

77.     The various documents which were exchanged in this transaction were sent by the RICO defendants through the use of both mails and facsimile and the funds associated with this purchase were sent via wire transfer to accounts designated by the RICO Defendants.

78.     The closing of the purchase of this building by Enterprise Properties occurred on or about July 1, 1994 (the "6900 Closing").

79.     At the 6900 Closing, the Limited Partnership "quit-claimed" its ownership interest in the Chemical Bank Building to Enterprise Properties, and Al-Rayes purchased the stock owned by the Hudson IRA for $4,500,000.

80.     Simultaneous with the 6900 Closing, Calvin Hudson and Ellen Hudson resigned as directors of Enterprise Properties, each of the officers resigned and a Certificate of Cancellation of Certificate of Limited Partnership was filed on behalf of the Limited Partnership

81.     As indicated above, the commission authorized by Al-Rayes for Willingham and the RICO Defendants was two and one-half percent of the purchase price, or

$112,500. However, of the $4,500,000 paid by the sole shareholder, $2,721,960.94 was used to retire the mortgage given on the property approximately two months earlier; $1,024,622.08. was paid to the Hudsons; $483,643.68 was paid to Corim, Inc.; and the balance was used to pay miscellaneous charges, resulting in an improper and undisclosed profit to the RICO Defendants on this transaction of approximately $693,155.

**B. 127 Abercorn Street (Savannah, Georgia)**

82.     In or around November 1994, Willingham, on behalf of the other RICO Defendants, suggested to Al-Rayes that he purchase a second commercial building in the United States.

83.     This time, Willingham mailed to Vanotti, on behalf of Al-Rayes, a "disclosure package" concerning a building known as 127 Abercorn Street, located in Savannah, Georgia and sometimes referred to as the "Cluskey Building."

84.     Specifically, in late October 1994, Willingham contacted Vanotti and indicated he had located another commercial property in which Al-Rayes might be interested.

85.     Willingham indicated to Al-Rayes that the Cluskey Building included a four story office structure with an attached two story building and an adjoining parking lot with 16 parking spaces.

86.     Willingham again indicated that the purchase should be made first by Corim, Inc., which would then sell the property to Enterprise Properties; this procedure was,

according to Willingham, necessary to avoid a mark-up in sale price due to the seller learning that the buyer was a foreign citizen.

87.     Al-Rayes responded that he was interested and, after viewing the property, agreed to a purchase by Enterprise Properties for the price of $1,171,650, a number suggested by Willingham.

88.     Again, the various documents which were exchanged in this transaction were sent by the RICO defendants through the use of both mails and facsimile and the funds associated with this purchase were sent via wire transfer to accounts designated by the RICO Defendants.

89.     Al-Rayes made a down payment of $600,000 on November 8, 1994 by wire transfer into a Corim, Inc. bank account. Thereafter, on or about November 28, 1994, Al-Rayes paid the balance of the purchase price of $571,650 by wire transfer into the same Corim, Inc. bank account. The closing of the purchase of this building by Enterprise Properties occurred on or about December 27, 1994.

90.     Again, it turns out that a substantial profit by the RICO Defendants was made at the expense of Al-Rayes.  Specifically, a review of the County Clerk's records shows that the RICO defendants were selling, repurchasing and then reselling the Cluskey Building to various "investors" for decades and that the "investor" to whom they had last sold the Cluskey Building paid $700,000.

91.     In particular, contrary to his representations that Corim, Inc. would buy the Cluskey Building from an unrelated third party on behalf of Al-Rayes, he was actually acting

as the estate representative for a former investor who died, allowing him to re-sell the property at this time.

92.       It is still unknown how much of the $1,171,650 paid by Al-Rayes for the Cluskey Building was transferred to this former investor and how much was retained by the RICO Defendants, however discussions with the beneficiaries of the estate confirmed that their aunt, the deceased client of the RICO Defendants, was also a victim of the same type of scheme described herein, perpetrated by the RICO Defendants on her for several years and in connection with several properties before she died.

93.       On or about October 3, 2003, Willingham convinced Enterprise Properties to sell the Cluskey Building to a third party for $1,275,000.

94.       In connection with this litigation, the plaintiffs recently learned that, without their knowledge, the RICO Defendants had not sold them the entire parcel included with the Cluskey Building, but had, instead, retained the parcel which made up the parking lot for the building.

95.       It was also learned that, not only did the RICO Defendants secretly sell this parcel to the same third party buyer to which Enterprise Properties sold the Cluskey Building, but they did so at an undisclosed profit of $425,000.

96.       Moreover, during the period that Enterprise Properties held title to the Cluskey Building, the RICO Defendants sold and repurchased this parking lot property, used it as security to borrow funds, transferred it by and among several of the RICO Defendants and

even used it as security for a loan used to pay other aggrieved participants in real estate transactions with the RICO Defendants.

**C. Other Sums Paid by Enterprise Properties to the RICO Defendants**

97.     After each building was purchased by the RICO Defendants for Enterprise Properties, a management agreement was entered into whereby Willingham, directly and through various Corim defendants, including without limitation, Corim Florida, Corim Terratrade, Inc., Corim Property Services, Corim, Inc. and Intrepid, agreed to perform management and brokerage services. These management agreements were revised in July 2003 and are collectively referred to herein as the "Enterprise Management Agreements."

98.     Enterprise Properties entered into the Enterprise Management Agreements on July 1, 1994 with Corim Florida, on December 27, 1994 with Corim Terratrade, Inc., on September 1, 1997 with Corim Property Services and on July 1, 2003 with Intrepid.

99.     Under the Enterprise Management Agreements, Willingham and the other defendants represented that they were registered by the states in which such services were to be provided – in this case, Florida and Georgia.

100.     Contrary to these representations, none of the RICO Defendants was ever licensed in any state to perform the services described in the Enterprise Management Agreements.

101.     Notwithstanding this failure to register, as required as a prerequisite in both Florida and Georgia to taking management or brokerage fees, Willingham and his

companies improperly took commissions and fees under the management agreements in an amount to be determined at trial, but believed to be in excess of $11,000,000.

## The Ranger Investments, Inc. Transactions

### I.

### The "Ranger Package"

102.     In early 1995, Willingham suggested that Al-Rayes look at a building in Atlanta, Georgia which had been the home of Hewlett-Packard, but was, at the time of the solicitation, vacant. Al-Rayes reviewed the opportunity, but declined. He did indicate, however, that he was interested in the Atlanta market.

103.     Shortly thereafter, Willingham suggested that he could purchase a package of four buildings from various third parties including 1640 Powers Ferry Road, Unit 24, 1827 Powers Ferry Road, Buildings 16 and 17, all located in Atlanta, Georgia and 170 Second Avenue North, located in Nashville, Tennessee (collectively referred to as the "Ranger Package"). In connection with this solicitation, Willingham mailed four "disclosure packages" to Vanotti's office in Switzerland describing the four office buildings.

104.     After traveling to Atlanta to view the properties, Al-Rayes agreed purchase all four.

105.     To facilitate this purchase, Willingham suggested the incorporation of a new entity, Ranger Investments, Inc., which again was named after an aircraft carrier depicted in a photo from Willingham's office.

106.     According to a letter mailed by Willingham to Vanotti on May 23, 1995, Ranger had been incorporated and was ready to purchase the Ranger Package.

107.     In fact, Ranger was actually incorporated on June 6, 1995 with Willingham acting as the initial sole director.

108.     Al-Rayes was the sole shareholder of Ranger, as well as officer and director and Willingham was appointed Secretary of Ranger.

109.     The initial resolutions of Ranger's board of directors included authorizing Willingham to purchase the Ranger Package at a total price not to exceed $5,700,000.

110.     Willingham again advised Al-Rayes to use one of his Corim entities to purchase these properties to avoid the inevitable mark-ups if the seller realized the identity of the true buyer.

111.     Willingham did not mention that he intended to obtain these properties for substantially less than the price at which he claimed they were being offered.

112.     In fact, Willingham agreed with Al-Rayes that, like with the Enterprise Properties transactions, he would split a five percent commission with Vanotti and that this would be the only profit to the RICO Defendants other than the fees associated with management and brokerage services after the purchases.

113.     Again, the various documents which were exchanged in the transactions described below were sent by the RICO defendants through the use of both mails and facsimile

and the funds associated with this purchase were sent via wire transfer to accounts designated by the RICO Defendants.

## A.  1640 Powers Ferry Road, Unit 24

114.     The first of the four buildings in the Ranger Package was the building known as 1640 Powers Ferry Road, Unit 24, located in Atlanta, Georgia.

115.     According to representations by Willingham, this property was owned by a Chinese investor which wanted to sell its interest.

116.     Contrary to Willingham's representation, this building was purchased by Corim, Inc. in a bankruptcy sale on or about March 29, 1989 for a mere $123,000.

117.     Of $5,700,000 wired to an account designated by the RICO Defendants on or about June 15, 1995, Ranger paid $1,100,000 for this property.

118.     Corim, Inc. deeded this property to Ranger on June 19, 1995, resulting in an improper and undisclosed gross profit to the RICO Defendants on this transaction of $977,000.

## B.  1827 Powers Ferry Road, Building 16

119.     The second building in the Ranger Package was the building known as 1827 Powers Ferry Road, Building 16, located in Atlanta, Georgia.

120.     Of $5,700,000 wired to an account designated by the RICO Defendants on or about June 15, 1995, Ranger paid $500,000 for this property.

121.     Willingham represented that the owner of this building was an unaffiliated third party. Instead, this property had been purchased by Jegen, one of Willingham's companies, in 1988 and then resold to Corim Terratrade on June 19, 1995, the same day the property was deeded by Corim Terratrade to Ranger. Corim Terratrade paid a mere $176,200 for this property, resulting in an improper and undisclosed gross profit to the RICO Defendants on this transaction of $323,800.

**C.  1827 Powers Ferry Road, Building 17**

122.     The third building in the Ranger Package was the building known as 1827 Powers Ferry Road, Building 17, located in Atlanta, Georgia.

123.     Of $5,700,000 wired to an account designated by the RICO Defendants on or about June 15, 1995, Ranger paid $500,000 for this property.

124.     As in the case of 1827 Powers Ferry Road Building 16, Willingham represented that the owner of this building was an unaffiliated third party. Again, however, this property had been purchased by Jegen in 1988 and then resold to Corim Investments on June 19, 1995, which in turn transferred the property that same day to Corim Terratrade. Also on June 19, 1995, the property was deeded by Corim Terratrade to Ranger. Corim Investments paid a mere $102,000 for this property, resulting in an improper and undisclosed gross profit to the RICO Defendants on this transaction of $398,000.

**D.  170 Second Avenue North**

125.      The last of the four properties included in the Ranger Package was the
building known as 170 Second Avenue North, located in Nashville, Tennessee.

126.      Of $5,700,000 wired to an account designated by the RICO Defendants on
or about June 15, 1995, Ranger paid $3,600,000 for this property.

127.      Contrary to representations that this property was owned by an unrelated
third party and that Corim Tennessee was necessary to take title to this property to avoid a mark-
up in price, Corim Tennessee actually took title to this property from Corim, Inc., which had
previously purchased the property for a mere $1,230,000 and then immediately deeded the
property to Ranger on June 20, 1995 with an improper and undisclosed gross profit to the RICO
Defendants of $2,370,000.

## II.

### 833 Campbell Hill

128.      On or about August 23, 1995, Willingham mailed to Vanotti, on behalf of
Al-Rayes, a solicitation whereby Willingham offered to negotiate the purchase by Ranger of the
building known as 833 Campbell Hill, located in Atlanta, Georgia sometimes referred to as the
"Kenmar Medical Building."

129.      In his August 23 letter, Willingham stressed the need to act quickly and
even place a deposit on the building so that owner would not sell it to another party prior to Al-
Rayes making his next visit to the United States.

25

130.     Ultimately, Al-Rayes paid a "good faith deposit" of $800,000 and Vanotti informed Willingham of their intent to visit Atlanta in November 1995 to view the Kenmar Medical Building.

131.     On November 7, 1995, the RICO Defendants faxed a rent roll and income projection from the Corim offices in Jacksonville to Vanotti in Switzerland.

132.     Thereafter, on November 8, 1995, Willingham mailed a letter to Vanotti wherein he wrote that, although the owner had much higher "price expectations," Willingham felt confident that he could negotiate the owner down to a range of $8.6-8.7 million, but only if the sale could be accomplished before year-end so that the owner could "take advantage of certain tax advantages available to him."

133.     In a November 27, 1995 response, after visiting Atlanta on November 20 and 21, 1995 to view this building, Al-Rayes offered to purchase the Kenmar Medical Building for $8,500,000.

134.     On or about December 20, 1995, Al-Rayes wired the balance of the funds required to purchase the Kenmar Medical Building -- $7,700,000.

135.     The closing of the purchase of this building occurred on or about December 22, 1995.

136.     Corim, Inc. actually deeded this property to Ranger on December 29, 1995, the same day the property was deeded to Corim, Inc. by the prior owner based on a

purchase price of a mere $5,950,000, resulting in an improper and undisclosed gross profit to the RICO Defendants on this transaction of $2,550,000.

137.     On or about July 8, 1998, in connection with a refinancing and at the request of the lender, Ranger's interest in this building was deeded by Ranger to a bankruptcy-remote entity, Ranger-Kenmar.

### III.

### Other Sums Paid by Ranger to the RICO Defendants

138.     After each building was purchased by the RICO Defendants for Ranger, a management agreement was entered into whereby Willingham, directly and through various Corim defendants, including without limitation, Corim Tennessee, Corim Terratrade, Inc., Corim Property Services, Corim, Inc. and Intrepid, agreed to perform management and brokerage services.  These management agreements were revised in July 2003 and are collectively referred to herein as the "Ranger Management Agreements."

139.     Ranger entered into the Ranger Management Agreements on June 8, 1995 with Corim Tennessee, on June 8, 1995 with Corim Terratrade, on September 1, 1997 with Corim Property Services, on January 1, 1996 with Corim Terratrade and on July 1, 2003 with Intrepid.

140.     Under the Ranger Management Agreements, Willingham and the other defendants represented that they were registered by the states in which such services were to be provided – in this case, Tennessee and Georgia.

141.     Contrary to these representations, none of the RICO Defendants was ever licensed in any state to perform the services described in the Ranger Management Agreements.

142.     Notwithstanding this failure to register, as required as a prerequisite in both Tennessee and Georgia to taking management or brokerage fees, Willingham and his companies improperly took commissions and fees under the management agreements in an amount to be determined at trial, but believed to be in excess of $11,000,000.

### The Essex Investments, Inc. Transactions

#### A. 1775 The Exchange, SE

143.     In or around July 1997, Vanotti received a solicitation from the RICO Defendants whereby Willingham offered to negotiate the purchase by Al-Rayes of the building known as 1775 The Exchange, SE, located in Atlanta, Georgia, sometimes referred to as the "Triangle Building."

144.     This solicitation involved both facsimiles and telephone calls by Willingham and Ortagus to Vanotti which were followed by a couriered informational package concerning the property delivered to Vanotti by Corim AG.

145.     Once again, Willingham insisted that this purchase be made by his company, in this case New Bethel, to insure that the price would not be unduly inflated by the seller.

146.     In addition, Willingham suggested that he set up Essex for the purpose of taking title to this property.

147.     Ultimately, Willingham set up Essex, using Corim, Inc. to pay the various fees associated with this process.

148.     Willingham was an initial officer of Essex at the time of its incorporation on or about July 3, 1997.

149.     After reviewing substantial reports concerning the Triangle Building delivered by Willingham, Al-Rayes agreed to purchase the Triangle Building for a price of $9,800,000.

150.     Ultimately, New Bethel deeded this property to Essex on September 29, 1997. New Bethel did not obtain the property, however, until September 30, 1997.

151.     New Bethel paid $7,990,000 for this property, resulting in an improper and undisclosed gross profit to the RICO Defendants on this transaction of $1,810,000.

152.     Thereafter, in connection with a refinancing and at the request of the lender, Essex's interest in this building was transferred by Essex to a bankruptcy-remote entity, Essex-Triangle.

**B. 1950 Spectrum Circle**

153.     In late Spring/Early Summer 1998, Vanotti received a solicitation from Willingham whereby, on behalf of the other RICO Defendants, Willingham offered to negotiate the purchase by Al-Rayes of the building known as 1950 Spectrum Circle, located in Atlanta, Georgia, sometimes referred to as the "Corporate Spectrum Building."

154.     Again, Willingham delivered informational material concerning this property to Vanotti, on behalf of Al-Rayes wherein Willingham claimed that the seller wanted $24,000,000 for this property.

155.     Willingham accomplished this delivery by sending the materials to Corim AG, which then hand delivered the package to Vanotti.

156.     The closing of the purchase of this building occurred on or about July 1, 1998.

157.     Ranger paid $23,489,000 for this property.

158.     Contrary to representations by Willingham he was acting as agent for the buyer in this transaction, a company he founded and for which he was still serving as officer, Willingham engineered a purchase of this property whereby he used Al-Rayes' money to purchase the property for substantially less than he disclosed to the plaintiffs, then sold the property to Essex at an inflated price.

159.     Specifically, this property was sold to Essex by Intrepid on July 1, 1998, however, this property was purchased by Intrepid from the prior owner seven days *after* the 1950 Closing. Intrepid paid only $18,800,000, resulting in an improper and undisclosed gross profit to the RICO Defendants on this transaction of $4,689,000.

## C. Other Sums Paid by Essex to the RICO Defendants

160.     After each building was purchased by the RICO Defendants for Enterprise Properties, a management agreement was entered into whereby Willingham, directly and through

various Corim defendants, including without limitation, Corim Property Services and Intrepid, agreed to perform management and brokerage services. These management agreements were revised in July 2003 and are collectively referred to herein as the "Essex Management Agreements."

161.    Essex entered into the Essex Management Agreements on July 31, 1997 and on or about July 1, 1998 with Corim Property Services and on July 1, 2003 with Intrepid.

162.    Under the Essex Management Agreements, Willingham and the other defendants represented that they were registered by the states in which such services were to be provided – in this case, Georgia.

163.    Contrary to these representations, none of the RICO Defendants was ever licensed in any state to perform the services described in the Essex Management Agreements.

164.    Notwithstanding this failure to register, as required as a prerequisite in Georgia to taking management or brokerage fees, Willingham and his companies improperly took commissions and fees under the management agreements in an amount to be determined at trial, but believed to be in excess of $11,000,000.

## Other Breaches/Failures under the Various Management Agreements

165.    In addition to the fact that the defendants were improperly taking commissions and fees for services purportedly performed under the various management agreements, in connection with the termination of these agreements the plaintiffs discovery that mismanagement and willful neglect have left the buildings in a state of general disrepair, as well

31

as fracturing the plaintiffs' relationship with the tenants (many of whom have consequently abandoned the buildings upon least termination).

166.     Specific examples of mismanagement and willful neglect discovered by new management, upon taking over the properties, include:

(a)     the roof at the Corporate Spectrum building was leaking profusely while under the watch of the defendants, resulting in severe water intrusion into the building and estimated repair costs of at least $200,000;

(b)     the individual properties were found to have miscellaneous defects relating to neglect which have, to date, resulted in repair costs of more than $100,000;

(c)     accounting records and financial statements are missing;

(d)     tax returns are missing; defendants have refused to confirm even that the returns were filed as promised and required by the agreements between the parties; and

(e)     the collective occupancy rate for the properties is less than 50% due to the failure on the part of the defendants to take reasonable steps to lease space to new tenants or renew leases with existing tenants.

167.     In addition, Intrepid has yet to remit to plaintiffs the outstanding security deposits that it held for tenants which totaled more than $100,000.

168.     Notwithstanding the above deficiencies, it has been determined that the defendants were charging approximately three times more for management fees than the industry standard.

## COUNT ONE – Against all Defendants
### (18 U.S.C. § 1962(c))

169.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 168 hereof as if restated herein.

## The Enterprise

170.     This count seeks to recover as against the RICO Defendants for losses suffered directly and proximately by plaintiff as a result of the scheme orchestrated and carried out by the RICO Defendants.

171.     Each of the statements and representations by the RICO Defendants described above were false and were made with the intent of deceiving the plaintiffs and others.

172.     In reliance upon the RICO Defendants' fraudulent statements and representations as described above, plaintiffs have suffered substantial damages.

173.     The RICO Defendants, acting together and in concert with others, are an association in fact, which functioned together as a continuing unit with an ascertainable structure separate and distinct from the "pattern of racketeering activity" alleged herein, and, which, therefore, constitutes an "enterprise within the meaning of 18 U.S.C. § 1961(4).

174.     In addition, or in the alternative, Intrepid, Corim AG, Corim, Inc., Corim Terratrade, Corim Florida, Corim Tennessee, Corim Investments, Corim Property Services, the

Hudson IRA, Jegen and New Bethel each constitutes a separate "enterprise" within the meaning of 18 U.S.C. § 1961(4).

175.     Each of the foregoing "enterprises" engaged in, and their activities affected, interstate commerce.

### The "Pattern Of Racketeering Activity"

176.     Each of the RICO Defendants, including the corporate RICO Defendants, is a "person" within the meaning of 18 U.S.C. § 1961(3) and conducted a pattern of racketeering activity as herein alleged.

177.     More specifically, the RICO Defendants directly engaged in or aided and abetted a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), involving multiple predicate acts of mail fraud (18 U.S.C. § 1341), and wire fraud (18 U.S.C. § 1343).

### Mail Fraud

178.     The RICO Defendants violated 18 U.S.C. § 1341 in that, acting jointly or in concert, they devised and intended to devise, or aided and abetted, a scheme or artifice to defraud, or for obtaining monies or property by means of false or fraudulent pretenses, representations, or promises as hereinabove set forth, including material omissions, and, for the purpose of executing such scheme or artifice, or attempting to do so, placed or caused to be placed matters or things in the United States mails and took from and received from, or caused others to take from and receive from, the United States mails matters or things, in furtherance of the scheme or artifice to defraud as set forth herein, and it was reasonably foreseeable that these mailings would take place in furtherance thereof.

179.     As hereinabove alleged, the RICO Defendants, among other things, mailed or caused to be mailed, a variety of documents in furtherance of their fraud.

## Wire Fraud

180.     The RICO Defendants violated 18 U.S.C. § 1343, in that, acting jointly or in concert, they devised and intended to devise, or aided and abetted, a scheme or artifice to defraud, and for obtaining money or property by means of false or fraudulent pretenses, representations or promises as set forth above, including material omissions, and for the purpose of executing such scheme or artifice or attempting to do so, transmitted or caused to be transmitted by means of wire communications in interstate or foreign commerce, writings, signs, signals, pictures and sounds, for the purpose of executing and in furtherance of the scheme or artifice to defraud set forth herein, and it was reasonably foreseeable that these transmissions would take place in furtherance thereof.

181.     As hereinabove alleged, the RICO Defendants, among other things, in furtherance of their scheme to defraud, made or caused to be made numerous interstate and international telephone calls and sent or caused to be sent numerous interstate and international facsimiles and e-mails.

## Continuity

182.     The scheme by the RICO Defendants to defraud and injure plaintiffs and others began in 1984, when they defrauded Caldas, at the latest, and continued until at least March 2005, when plaintiffs discovered that they had been defrauded by the RICO Defendants.

## Violation Of Section 1962(c) By the RICO Defendants

183.     The RICO Defendants were employed by or associated with the "enterprise" or the "association in fact" enterprise and, in violation of 18 U.S.C. § 1962(c), they conducted or participated in, directly or indirectly, the conduct of the affairs of the foregoing enterprises, by their operation or management of these enterprises in connection with or through the pattern of racketeering activity set forth above.

184.     As a direct and proximate result of the foregoing violation of 18 U.S.C. § 1962(c), plaintiffs and others were induced to and did invest substantial sums into the Properties at inflated values, and have suffered other losses to be determined at the trial of this action.

185.     Pursuant to 18 U.S.C. § 1964(c), plaintiffs are entitled to treble their general and special compensatory damages, plus interest, costs and attorneys' fees.

### COUNT TWO – Against all Defendants
### (18 U.S.C. § 1962(d) – Conspiracy To Violate 18 U.S.C. § 1962(c))

186.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 185 hereof as if restated herein.

187.     This count seeks to recover as against the RICO Defendants for losses suffered directly and proximately by plaintiffs as a result of the scheme orchestrated and carried out by the RICO Defendants.

188.     The RICO Defendants conspired with one another to violate the provisions of 18 U.S.C. § 1962(c).

189.    At all relevant times, the RICO Defendants knowingly agreed and conspired with each other to commit or to assist in the commission of at least two of the predicate acts set forth above, and they did so with the knowledge and intent that such acts were in furtherance of the foregoing pattern of racketeering in that, among other things, such predicate acts were designed to misrepresent and conceal the true nature of their scheme to defraud plaintiffs and others in, among other things, the purchase of commercial real estate at inflated prices.

190.    In furtherance of their conspiracy to violate 18 U.S.C. § 1962(c), the RICO Defendants engaged in the above-described pattern of racketeering activity and, by their operation or management of the enterprises, through a pattern of racketeering activity, each of them conducted or participated, directly or indirectly, in the conduct of the affairs of one or more of said enterprises.

191.    As a direct and proximate result of the foregoing conspiracy in violation of 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(c), plaintiffs and others were induced to, and did, purchase the Properties at inflated prices, and have suffered additional losses in an amount to be determined at the trial of this action.

## COUNT THREE – Against all Defendants
### (State RICO Violations - Florida)

192.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 191 hereof as if restated herein.

193.    The acts and omissions of the RICO Defendants also violated Title XLV, Chapter 772 of the Florida Statutes, otherwise known as the "Civil Remedies for Criminal Practices Act" (the "CRCPA").

194.    Specifically, not only were the above-described acts of wire and mail fraud violative of the CRCPA, by using the above-described fraudulent scheme to sell securities to Al-Rayes, the RICO Defendants violated Chapter 517 relating to securities transactions, otherwise known as the "Florida Securities and Investor Protection Act."

195.    As a proximate consequence of these acts and omissions of the RICO Defendants, the plaintiffs were damaged in an amount to be determined a trial, but in an amount which exceeds the jurisdictional limits of this Court.

## COUNT FOUR – Against all Defendants
### (State RICO Violations - Georgia)

196.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 191 hereof as if restated herein.

197.    The acts and omissions of the RICO Defendants also violated Title 16, Chapter 14 of the Georgia Code, otherwise known as the "Georgia RICO (Racketeer Influenced and Corrupt Organizations) Act" (the "GRA").

198.    Specifically, the above-described acts of wire and mail fraud were violative of the GRA.

199.    As a proximate consequence of these acts and omissions of the RICO Defendants, the plaintiffs were damaged in an amount to be determined a trial, but in an amount which exceeds the jurisdictional limits of this Court.

## COUNT FIVE – Against all Defendants
### (State RICO Violations - Tennessee)

200.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 191 hereof as if restated herein.

201.    The acts and omissions of the RICO Defendants also violated Title 16, Chapter 14 of the Tennessee Code, otherwise known as the "Racketeer Influenced and Corrupt Organization Act of 1989" (the "RICO Act of 1989").

202.    Specifically, the above-described acts of wire and mail fraud were violative of the RICO Act of 1989.

203.    As a proximate consequence of these acts and omissions of the RICO Defendants, the plaintiffs were damaged in an amount to be determined a trial, but in an amount which exceeds the jurisdictional limits of this Court.

## COUNT SIX – Against all Defendants
### (Common Law Fraud)

204.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 191 hereof as if restated herein.

205.     This count seeks to recover from the RICO Defendants for losses suffered directly and proximately by plaintiffs a result of the fraudulent scheme orchestrated and carried out by the RICO Defendants.

206.     The RICO Defendants, directly, and in conspiracy with one another, and as aiders and abettors, did willfully induce, directly or indirectly, plaintiffs to purchase the Properties at inflated prices, by knowingly making, or aiding and abetting others in making, material misrepresentations to plaintiffs, both orally and in writing, and engaged in manipulative and deceptive conduct, as alleged herein. Those statements and that conduct were, unbeknownst to plaintiffs, false and misleading with respect to material facts or omitted to state material facts necessary in order to make the statements made not misleading, and were made and done by the RICO Defendants with the intention and knowledge that plaintiffs would rely upon them.

207.     The RICO Defendants intentionally made the false statements and omissions and engaged in the conduct described herein, in order to induce plaintiffs to purchase the Properties at inflated prices.

208.     Such conduct by the RICO Defendants constitutes the use or employment of deception, deceptive acts or practices, fraud, false pretenses, false promises, misrepresentations, or concealment, suppression or omission of material facts with the intent that plaintiffs would rely upon such acts and concealment in connection with the transactions falsely fostered and encouraged by the RICO Defendants and which induced plaintiffs to purchase the Properties at inflated prices.

209.     At the time the misrepresentations were made, they were known by the RICO Defendants to be false, and such statements by and acts of the RICO Defendants were made and done with the intent of deceiving and defrauding plaintiffs.

210.     Plaintiffs reasonably relied upon the false and misleading statements, omissions and deceptive conduct of the RICO Defendants.

211.     The RICO Defendants conspired with and aided and abetted the wrongful activity of the others, knowing that activity to be wrongful, by lending substantial assistance to that activity including, without limitation, preparing or inducing others to prepare, fraudulent e-mails, letters, and other communications regarding their purported ability and intent to work on behalf of, as agents for, the plaintiffs to locate and purchase commercial office buildings at fair market prices, and, in order to conceal the true intent of the scheme.

212.     As a direct and proximate result of this wrongful conduct, plaintiffs were induced to purchase the Properties at inflated prices, and have suffered additional losses in an amount to be determined at the trial of this action.

## COUNT SEVEN – Against all Defendants
### (State Broker Registration Violations - Florida)

213.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 168 hereof as if restated herein.

214.     The fact that the Defendants were taking payment of commissions and fees for their "services" relating to the brokering, selling, exchanging, leasing renting or offering

of the Properties or of an interest in the Properties also violated Title XXXII, Chapter 475 of the Florida Statues.

215.    Specifically, the commission of the above-described acts by the defendants, who were not licensed in the State of Florida as brokers, violated Chapter 475.

216.    As a proximate consequence of these acts and omissions of the defendants, the plaintiffs were damaged in an amount to be determined a trial, but in an amount which exceeds the jurisdictional limits of this Court.

**COUNT EIGHT – Against all Defendants**
**(State Broker Registration Violations - Georgia)**

217.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 168 hereof as if restated herein.

218.    The fact that the Defendants were taking payment of commissions and fees for their "services" relating to the brokering, selling, exchanging, leasing renting or offering of the Properties or of an interest in the Properties also violated Title 43, Chapter 40 of the Georgia Code.

219.    Specifically, the commission of the above-described acts by the defendants, who were not licensed in the State of Georgia as brokers, violated Chapter 40.

220.    As a proximate consequence of these acts and omissions of the defendants, the plaintiffs were damaged in an amount to be determined a trial, but in an amount which exceeds the jurisdictional limits of this Court.

## COUNT NINE – Against all Defendants
### (State Broker Registration Violations - Tennessee)

221.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 168 hereof as if restated herein.

222.     The fact that the Defendants were taking payment of commissions and fees for their "services" relating to the brokering, selling, exchanging, leasing renting or offering of the Properties or of an interest in the Properties also violated Title 62, Chapter 13 of the Tennessee Code, otherwise known as the "Tennessee Real Estate Broker License Act of 1973" (the "TREBLA").

223.     Specifically, the commission of the above-described acts by the defendants, who were not licensed in the State of Tennessee as brokers, violated the TREBLA.

224.     As a proximate consequence of these acts and omissions of the defendants, the plaintiffs were damaged in an amount to be determined a trial, but in an amount which exceeds the jurisdictional limits of this Court.

## COUNT TEN – Against Corim Florida,
### Corim Property Services and Intrepid
### (Breach of Contract – Chemical Bank Building Management Agreement)

225.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 168 hereof as if restated herein.

226.     The above-described Management Agreements entered into between Enterprise Properties, Corim Florida, Corim Property Services and Intrepid were valid contracts.

227.     Plaintiffs performed all obligations required of them under the Management Agreements.

228.     Defendants breach their own performance obligations set forth in the Management Agreements as set forth above.

229.     As a result of the breaches by defendants, plaintiffs have been damaged in an amount to be determined at trial, but in an amount which exceeds the jurisdictional limits of this Court.

**COUNT ELEVEN –Against Corim**
**Terratrade, Inc., Corim Property Services and Intrepid**
**(Breach of Contract – Cluskey Building Management Agreement)**

230.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 168 hereof as if restated herein.

231.     The above-described Management Agreements entered into between Enterprise Properties, Corim Terratrade, Inc., Corim Property Services and Intrepid were valid contracts.

232.     Plaintiffs performed all obligations required of them under the Management Agreements.

233.     Defendants breach their own performance obligations set forth in the Management Agreements as set forth above.

234.     As a result of the breaches by defendants, plaintiffs have been damaged in an amount to be determined at trial, but in an amount which exceeds the jurisdictional limits of this Court.

## COUNT TWELVE –Against Corim
## Terratrade, Inc., Corim Property Services and Intrepid
### (Breach of Contract – 1640 Powers Ferry Road, Unit 24, Management Agreement)

235.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 168 hereof as if restated herein.

236.     The above-described Management Agreements entered into between Enterprise Properties, Corim Terratrade, Inc., Corim Property Services and Intrepid were valid contracts.

237.     Plaintiffs performed all obligations required of them under the Management Agreements.

238.     Defendants breach their own performance obligations set forth in the Management Agreements as set forth above.

239.     As a result of the breaches by defendants, plaintiffs have been damaged in an amount to be determined at trial, but in an amount which exceeds the jurisdictional limits of this Court.

## COUNT THIRTEEN –Against Corim
## Terratrade, Inc., Corim Property Services and Intrepid
**(Breach of Contract –1827 Powers Ferry Road, Building 16, Management Agreement)**

240.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 168 hereof as if restated herein.

241.    The above-described Management Agreements entered into between Enterprise Properties, Corim Terratrade, Inc., Corim Property Services and Intrepid were valid contracts.

242.    Plaintiffs performed all obligations required of them under the Management Agreements.

243.    Defendants breach their own performance obligations set forth in the Management Agreements as set forth above.

244.    As a result of the breaches by defendants, plaintiffs have been damaged in an amount to be determined at trial, but in an amount which exceeds the jurisdictional limits of this Court.

## COUNT FOURTEEN –Against Corim
## Terratrade, Inc., Corim Property Services and Intrepid
**(Breach of Contract –1827 Powers Ferry Road, Building 17, Management Agreement)**

245.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 168 hereof as if restated herein.

246.     The above-described Management Agreements entered into between Enterprise Properties, Corim Terratrade, Inc., Corim Property Services and Intrepid were valid contracts.

247.     Plaintiffs performed all obligations required of them under the Management Agreements.

248.     Defendants breach their own performance obligations set forth in the Management Agreements as set forth above.

249.     As a result of the breaches by defendants, plaintiffs have been damaged in an amount to be determined at trial, but in an amount which exceeds the jurisdictional limits of this Court.

**COUNT FIFTEEN –Against Corim Tennessee,
Corim Property Services and Intrepid**
**(Breach of Contract – 170 Second Avenue North Management Agreement)**

250.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 168 hereof as if restated herein.

251.     The above-described Management Agreements entered into between Enterprise Properties, Corim Tennessee, Corim Property Services and Intrepid were valid contracts.

252.     Plaintiffs performed all obligations required of them under the Management Agreements.

253.    Defendants breach their own performance obligations set forth in the Management Agreements as set forth above.

254.    As a result of the breaches by defendants, plaintiffs have been damaged in an amount to be determined at trial, but in an amount which exceeds the jurisdictional limits of this Court.

**COUNT SIXTEEN –Against Corim
Terratrade, Inc., Corim Property Services and Intrepid
(Breach of Contract – Kenmar Medical Building Management Agreement)**

255.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 168 hereof as if restated herein.

256.    The above-described Management Agreements entered into between Enterprise Properties, Corim Terratrade, Inc., Corim Property Services and Intrepid were valid contracts.

257.    Plaintiffs performed all obligations required of them under the Management Agreements.

258.    Defendants breach their own performance obligations set forth in the Management Agreements as set forth above.

259.    As a result of the breaches by defendants, plaintiffs have been damaged in an amount to be determined at trial, but in an amount which exceeds the jurisdictional limits of this Court.

## COUNT SEVENTEEN –Against
## Corim Property Services and Intrepid
**(Breach of Contract – Triangle Building Management Agreement)**

260.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 168 hereof as if restated herein.

261.     The above-described Management Agreements entered into between Enterprise Properties, Corim Florida, Corim Terratrade, Inc., Corim Property Services and Intrepid were valid contracts.

262.     Plaintiffs performed all obligations required of them under the Management Agreements.

263.     Defendants breach their own performance obligations set forth in the Management Agreements as set forth above.

264.     As a result of the breaches by defendants, plaintiffs have been damaged in an amount to be determined at trial, but in an amount which exceeds the jurisdictional limits of this Court.

## COUNT EIGHTEEN –Against
## Corim Property Services and Intrepid
**(Breach of Contract – Corporate Spectrum Building Management Agreement)**

265.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 168 hereof as if restated herein.

266.     The above-described Management Agreements entered into between Enterprise Properties, Corim Florida, Corim Terratrade, Inc., Corim Property Services and Intrepid were valid contracts.

267.     Plaintiffs performed all obligations required of them under the Management Agreements.

268.     Defendants breach their own performance obligations set forth in the Management Agreements as set forth above.

269.     As a result of the breaches by defendants, plaintiffs have been damaged in an amount to be determined at trial, but in an amount which exceeds the jurisdictional limits of this Court.

**COUNT NINETEEN – Against All Defendants**
**(Unjust Enrichment)**

270.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 191 hereof as if restated herein.

271.     This is a claim against all defendants for unjust enrichment in connection with the benefits each defendant received from its wrongful actions described herein.

272.     As articulated above, defendants unlawfully, fraudulently and intentionally obtained profits from the plaintiffs in connection with the purchases by the plaintiffs of the Properties and they obtained income from the brokerage and management of those properties without being licensed as required by the various states in which the properties are located.

50

273.    Defendants would be unlawfully, fraudulently and unjustly enriched if they were allowed to enjoy the benefits derived from their dealings with the plaintiffs.

274.    The fair value of the benefits conferred on and obtained by the defendants is the value of the profits made in connection with the purchase by plaintiffs of the Properties and the fees or other income received in connection with the brokerage and management of the Properties thereafter.

275.    Thus, by their actions, defendants have been unjustifiably enriched, and plaintiffs thereby damaged, in an amount to be proven at trial, but believed to be in excess of $25 million.

**COUNT TWENTY –Against Willingham**
**(Breach of Fiduciary Duty)**

276.    Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 191 hereof as if restated herein.

277.    Willingham was, at all relevant times, an executive officer of the corporate plaintiffs.

278.    At all relevant times, Willingham owed a fiduciary duty to the corporate plaintiffs and to their stockholder, Al-Rayes, to exercise due care in the negotiation and purchase of the Properties, as well as in the management of corporate assets.

279.    The foregoing conduct on the part of Willingham constitutes neglect of, or failure to perform, or other violation of his duties in the negotiation of the purchase of the

Properties, as well as in the management and disposition of corporate assets committed to his charge.

280.    The plaintiffs were damaged by the neglect of, or failure to perform, or other violation of Willingham's duties in the negotiation of the purchase of the Properties, as well as in the management and disposition of corporate assets committed to his charge.

281.    Plaintiffs are entitled to a judgment compelling Willingham to account for the aforesaid actions and omissions and which sets aside any such improper or unlawful conveyance, assignment or transfer of corporate assets and which enjoins Willingham from making or participating in further unlawful conveyances, assignments or transfers of corporate assets.

WHEREFORE, Plaintiffs demand that judgment be entered against Defendants as follows:

(a)    Under Counts One and Two, for treble damages, interest, costs and attorneys' fees, pursuant to 18 U.S.C. § 1964(c);

(b)    Under Counts Three, Four and Five, for treble damages, interest, costs and attorneys' fees, pursuant to applicable state law.

(e)    Under Count Six, for out of pocket damages, the costs and disbursement of this action and punitive damages;

(c)    Under Counts Seven, Eight and Nine, for treble compensatory and incidental damages, including without limitation, interest, costs and attorneys' fees, pursuant to applicable state law;

(d)     Under Counts Ten, Eleven, Twelve, Thirteen, Fourteen, Fifteen, Sixteen, Seventeen and Eighteen, for compensatory and incidental damages, including without limitation, the costs and disbursement of this action, as well as an order requiring the turnover of all books and records relating to the plaintiffs' businesses:

(e)     Under Count Nineteen, for compensatory damages, interest, and the costs and disbursement of this action;

(f)     Under Count Twenty, for compensatory and incidental damages, including without limitation, the costs and disbursement of this action;

(g)     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury as to all issues triable to a jury.

Dated: April 20, 2006

                    **GRAY ROBINSON, P.A.**

By: _____
                    Kenneth B. Jacobs, Esq.
                    Florida Bar No. 965080
                    Lee S. Haramis, Esq.
                    Florida Bar No. 398070
                    50 North Laura Street, Suite 1675
                    Jacksonville, Florida  32202
                    Tel: (904) 598-9929
                    Fax: (904) 598-9109

                    and

**LAZARE POTTER GIACOVAS
& KRANJAC LLP**

Michael T. Conway
Mario M. Kranjac
950 Third Avenue
New York, New York 10022
Tel: (212) 758-9300
Fax: (212) 888-0919

Attorneys for Plaintiffs

# 6800 v1